[991 NYS2d 868]

In the Matter of KAREN H.M., Petitioner, for the Appointment of a Guardian for the Personal Needs and Property Management of MIRIAM H., an Alleged Incapacitated Person.

Supreme Court, Bronx County, August 27, 2014

## APPEARANCES OF COUNSEL

*D. Andrew Marshall*, New York City, for petitioner.

*Cassidy Law Firm*, Purchase (*Michele Cassidy* and *Alexander Eisemann* of counsel), for cross petitioner.

*Mental Hygiene Legal Services*, Bronx (*Kimberly Tate-Brown* of counsel), Court Evaluator.

## OPINION OF THE COURT

SHARON A.M. AARONS, J.

A petition and cross petition have been filed for the appointment of a guardian of the person and property of Miriam H.,[1] an alleged incapacitated person (AIP). This court is satisfied that the AIP was served with the order to show cause and petition by personal delivery at least 14 days prior to the return date, and that all other necessary interested persons required to be served under Mental Hygiene Law § 81.07 were timely served with the order to show cause and petition.

Kimberly Tate-Brown, Esq. was appointed to serve as Court Evaluator. The hearing was held on March 7, March 31, and April 28, 2014. At the hearing the petitioner was represented by D. Andrew Marshall, Esq., 225 Broadway, New York, NY. The cross petitioner was represented by Michele Cassidy, Esq. and Alexander Eisemann, Esq.,[2] of counsel to the Cassidy Law Firm, 2900 Westchester Avenue, Purchase, New York.

The court heard the testimony of the petitioner, Karen H.M.; the cross petitioner, Robynne H.; Clinvern Delroy Murray, Esq., an attorney who effectuated the transfer of certain real prop-

---

1. Some identifying information, including the real names, addresses and professions of the parties and their witnesses, has been redacted to protect the privacy of those individuals.

2. Mr. Eisemann first appeared of counsel for the cross petitioner on the adjourned date of March 31, 2014, and became lead attorney at that time. Petitioner's counsel initially objected to the appearance of new counsel after testimony had already been taken, but subsequently withdrew the objection. (Tr, Mar. 31, at 6.)

erty of the AIP; Leroy H., the stepson of the AIP; James B., the AIP's brother; and Kimberly Tate-Brown, Esq., the Court Evaluator.

## Hearing Testimony
### Testimony of the Petitioner

The AIP, who is 85 years of age, resides at a three-family home owned by the petitioner located at 1115 N—, Bronx, New York.

The petitioner Karen H.M. testified that she is the AIP's daughter. She is a trained paramedic and Emergency Medical Technician (EMT), and presently teaches an EMT paramedic program at —. Prior to becoming an EMT, she was a New York City police officer, retiring with a full pension. The petitioner resides at 1115 N—, a residential dwelling which she owns, which is divided into three separate apartments. Five other family members, including the AIP, reside at the premises. The AIP resides on her own in a second-story apartment, for which she pays, or has paid, monthly rent. One of the petitioner's two daughters lives in another second-story apartment. The petitioner's other daughter, the petitioner, and the petitioner's grandson live in the remaining apartment.

The house was originally owned by the petitioner's grandfather, and has served as the family home in which the AIP, and later the AIP's children, resided. The house eventually passed by will from the petitioner's grandfather to the AIP, the cross petitioner and their brother. The petitioner voluntarily relinquished her interest because she had credit problems, and her name on the deed could result in denial of a mortgage. The AIP surrendered her interest in the premises at 1115 N—, to her daughter, the cross petitioner, in 2005. In 2008, the petitioner purchased the house from the cross petitioner for $431,000, which was approximately $150,000 less than the fair market value of the home, according to an appraisal which the petitioner obtained at that time. The cross petitioner used the funds to satisfy a $381,000 mortgage which the cross petitioner had taken out on the premises. The home, prior to the cross petitioner's refinancing, was encumbered only by a very small mortgage.

The petitioner stated that she was present when the AIP was diagnosed with Alzheimer's disease by a physician in December 2003. Since 2004, the AIP has been unable to shower herself, and thus the petitioner has been assisting her in that regard since that time.

The petitioner has been caring for her mother since the onset of her Alzheimer's disease. Until May 2013, the cross petitioner cared for the AIP on weekends, but discontinued doing so because of the AIP's difficulty in ambulating. At the present time, the petitioner provides all of the AIP's personal needs, while the cross petitioner attends to all of the AIP's financial matters. The petitioner wakes the AIP in the mornings, assists her to sit on the toilet, bathes her, and feeds her. The AIP is unable to feed herself, or take medication on her own. The AIP is asthmatic, and mostly remains in the home during the winter months. The petitioner administers medication to her mother, which she believes to be Namenda, Aricept, Amlodipine, Advil, Prednisone, Omega and a vitamin—she was uncertain of the exact identity of the pills, because they are purchased by her sister, the cross petitioner, who removes them from the bottles and provides them to the petitioner in pill boxes. The AIP has taken Namenda and Aricept since the onset of her Alzheimer's disease. On occasion, the cross petitioner has failed to timely provide medications for the AIP.

In 2013, the petitioner discovered banking statements in the house which indicated that the AIP has approximately $29,000 in a Chase account. The petitioner did not preserve these records. She testified that the cross petitioner failed to provide a coherent account of the disposition of these funds. Her mother, the AIP, although able to respond verbally, is unable to articulate in any coherent fashion, and is thus unable to communicate the disposition of these funds.

The petitioner receives Social Security payments, a pension from the New York City Housing Authority, and Medicare reimbursement of medical expenses. She also has an IRA account. The cross petitioner pays the petitioner $875 monthly for rent,[3] and $200 monthly for food.

The petitioner stated that she desired to become the guardian of the person and property of the AIP. She has become frustrated with the present, informal arrangement with the cross petitioner, pursuant to which she is required to ask the cross petitioner for necessaries for the AIP. She has never filed for bankruptcy, or been convicted of a crime.

The petitioner rested after giving her testimony, and called no other witnesses.

---

**3.** The petitioner testified that the cross petitioner has acknowledged that when the cross petitioner owned the premises at 1115 N—, the cross petitioner paid herself $1,075 as "rent" for the AIP.

Testimony of the Cross Petitioner

The cross petitioner Robynne H., who is a registered nurse, testified that she is the AIP's daughter. The AIP's children are herself, the petitioner, and two brothers, Leroy H. and Rahmel H. Her mother had first been diagnosed with Alzheimer's disease in July 2003.[4] She testified that in 2004, her mother fell, and required hospitalization, after which she was in a nursing home from August to the end of September. It was at this time, while she was in the nursing home, that the AIP executed a power of attorney[5] in favor of the cross petitioner, so that bills could be paid and other financial matters attended to. At that time the AIP was still mentally competent, despite her diagnosis of Alzheimer's disease, and was able to express her desire that the cross petitioner act as her attorney-in-fact. The power of attorney was entered into evidence after the petitioner withdrew her objection to admissibility based on an alleged defect in the jurat.[6]

She testified that the AIP stays in bed for long periods of time, laying in the same position. She is unable to visit the AIP, as the petitioner has not given her a key to the premises; often she had gone to see her mother and was not able to enter the locked apartment, as no one answered the door.[7] The AIP barely

---

**4.** A letter dated April 1, 2014, from the court evaluator, supplementing her report to the court based on her receipt of subpoenaed medical records, indicates that the AIP was first diagnosed with Alzheimer's disease by her primary care physician, Dr. Mathur, on July 9, 2003, at which time he indicated that she had "mild to moderate dementia." A neurologist, Dr. Rajesh Bhatnagar, indicated that he first evaluated the AIP on Dr. Mathur's referral in December 2003. He concurred in the diagnosis of "mild to moderate dementia." He further drafted a letter dated July 29, 2004, in which he opined that the AIP was "neurologically stable" and capable of making informed decisions.

**5.** The power of attorney is dated September 10, 2004, and was admitted into evidence at the hearing. The power of attorney is a 2004 New York statutory short form power of attorney, and grants the agent all of the powers listed on page 2 of the form. The jurat recites, "On *September 10, 2004* before me *Miriam H.*, personally appeared _____, personally known to me . . . ." The petitioner has argued in this proceeding that the jurat is defective because the form was not correctly filled out. Petitioner argues that the form should have been prepared so as to recite, "On *September 10, 2004* before me *[NAME OF NOTARY]*, personally appeared *MIRIAM H.*, personally known to me . . . ."

**6.** A previous power of attorney was executed by the AIP in December 2003, giving the cross petitioner authority over the AIP's IRA account.

**7.** The witness admitted, however, on questioning by the court, that on the occasions when she calls the petitioner and advises her that she intends to visit, she has not had a problem seeing the AIP.

utilizes her own apartment, and she opined that there was inadequate supervision in the home for the AIP's safety. It was the cross petitioner's desire to have the AIP reside with her in a room where she would not be required to navigate stairs, or to sleep alone in an upstairs apartment, where she might fall out of bed or otherwise injure herself.

The AIP also executed a health care proxy in which she listed the cross petitioner as agent, and then "reluctantly" appointed the petitioner, Karen H.M., as successor agent. She did so "reluctantly" because she was angry with the petitioner, as the petitioner had improperly used the AIP's credit card decades previously in a business venture, leaving the AIP with unpaid credit card debt of approximately $10,000, as a result of which the AIP was constrained to delay her retirement and work another year.

She testified that the AIP receives $2,022.23 monthly, which is disbursed as follows: $875 for "rent" paid to Karen H.M., $200 for food, $200 to $300 for utilities, and $70 for cable television.[8] Her mother has an IRA with approximately $10,000, which evidently was paid to the State as unclaimed funds. She stated that there were no other accounts, and denied any knowledge of an account, as testified by the petitioner, which contained approximately $29,000. In fact, the account that her mother had maintained was placed in the cross petitioner's sole name in 2004 or 2005.

The AIP would stay with the cross petitioner on weekends from 2006 until 2013. The cross petitioner indicated that she was no longer comfortable taking the AIP to physician's appointments on her own, without the assistance of another person, due to her concern that the AIP might fall and injure herself. However, the petitioner was not advising the cross petitioner of the time when medical appointments were scheduled, so that the cross petitioner was unable to accompany her mother to the appointments. On one occasion the petitioner agreed to and arranged cataract surgery for the AIP without advising the cross petitioner.

---

8. The witness did not explain how the approximate amount of $500 monthly, which remains after payment of these delineated expenses, is disposed of, except to state that she also purchases "toiletries and anything else that she may need," as well as health care expenses. No amount was provided for these additional expenses, and no receipts placed in evidence. Nor did the witness testify that money was expended on third-party caregivers. Nevertheless, the cross petition indicates that $240 to $340 weekly is paid in cash to caregivers.

The cross petitioner asserted that the petitioner failed to contribute her share to the household expenses when the AIP, the petitioner, and the cross petitioner were all residing at 1115 N—, creating a "hostile environment" which eventually impelled the cross petitioner to move out of 1115 N— and purchase the home of her brother, located at 2021 C—, who was moving to Florida. Accordingly, in 2006, the cross petitioner took out a mortgage on the home at 1115 N—, and used the proceeds to purchase her brother's home. The cross petitioner admitted that the AIP surrendered her interest in 1115 N— to the cross petitioner without any financial consideration.

The cross petitioner desired to be appointed sole guardian, and stated that she was ready and willing to have the AIP move into her home. She stated that she had never been convicted of a crime or declared bankruptcy.

Testimony of Clinvern Delroy Murray

Clinvern Delroy Murray, Esq., an attorney-at-law, was called as a witness by the cross petitioner. He testified that both Robynne H., the cross petitioner, and the AIP were his clients. He effectuated the transfer of the AIP's interest in 1115 N—, by quitclaim deed in 2004 to the cross petitioner, after speaking with the AIP for 10 to 15 minutes prior to the signing of the deed by the AIP in his offices, outside of the presence of the cross petitioner. He did so to assure himself that the AIP was competent and in fact desired to transfer her interest to only one of her children. The AIP was certain of what she wanted to do. It was his understanding that the AIP was "in the early stages of dementia," but he found her to be competent, coherent and lucid.

The deed was executed in 2004, but not recorded until 2006.[9] The witness spoke with the AIP again in his office in 2006 prior to the recording of the deed. He found the AIP to again be lucid and coherent, and she repeated her desire and intent to effectuate the transfer to the cross petitioner.

Testimony of Leroy H.

Leroy H., the AIP's stepson, was called as a witness by the cross petitioner. He is a retired employee of a New York State Fire Department, and now resides in Florida. He testified that some 30 years ago, he was present when the AIP indicated that

---

**9.** The witness testified that he was not asked to record the deed in 2004, but that it became necessary to do so in connection with a refinancing in 2006.

she desired the cross petitioner to handle her financial affairs, as the AIP was "furious" with the petitioner for misusing her credit card.

The witness relocated to Florida in 2006, having sold his home to the cross petitioner, and speaks to the cross petitioner biweekly by telephone. He speaks with the petitioner approximately once per year. He stopped visiting the AIP in 2006.

When his grandfather died, the house at 1115 N— was willed to himself, the petitioner, the cross petitioner, and the AIP. He surrendered his interest at that time so that the others could remain in the property.

Testimony of James B.

James B., called by the cross petitioner, testified that he is the AIP's brother. He last saw the AIP in March 2013, at his brother's birthday party. He cannot communicate with her by telephone because of her dementia, which "started getting bad around 2007 or 2008." He recounted, consistent with the testimony of the other witnesses, that the AIP was upset with the petitioner because she had misused the AIP's credit card, and was unable to retire. In addition, at that time, the AIP stated that she desired to have the cross petitioner attend to her financial affairs. He had no personal knowledge of the adequacy of the care given to the AIP by the petitioner.

Mr. B. testified that he had urged the petitioner to place the AIP in a nursing home because she was unhappy caring for her mother. He had been called to the petitioner's home approximately five years ago and tried to mediate a dispute between the petitioner and the cross petitioner as to the AIP's care and living conditions. He recommended a nursing home because the AIP would not have to navigate stairs, would have a more regular schedule, and would have more social interaction, as opposed to watching television.

Examination of the AIP

The AIP was present in court for much of the hearing, having been brought to court in a wheelchair. She was examined in court, but was not able to communicate with the court or to respond to any questions, even to state her name.

Testimony of the Court Evaluator

The Court Evaluator Kimberly Tate-Brown, Esq., testified that the AIP was nonverbal and uncommunicative when she attempted to interview her. Ms. Tate-Brown did not obtain any financial records. She did obtain medical records which indicated

that in 2003, the AIP was diagnosed with mild to moderate dementia. A medical record dated July 29, 2004, indicated that the AIP was of sound mind and capable of making decisions.

It was the Court Evaluator's understanding that the AIP remained downstairs during the day, and that she was monitored by the petitioner at night via a "baby monitor." She believed that the AIP could remain in the petitioner's home, although she did not observe the AIP walking in the home, nor did she observe her ability to navigate the stairs.

The Court Evaluator observed a 2003 will in which the AIP bequeathed her personal property equally between the petitioner and the cross petitioner, and granted her real property to the petitioner.

In court, the Court Evaluator recommended that an independent guardian be appointed, as she did not believe that the two sisters could set aside their differences and act in the best interests of the AIP.

Summations and Post Hearing Submissions

In summation, cross petitioner's counsel maintained that the power of attorney and health care proxy both had been executed at a time when the AIP was competent. Nevertheless, he conceded that "aspects of the house transaction . . . seem troublesome." He further conceded that "an independent guardian would be appropriate," and that the AIP "needs to be in an independent place . . . . where both daughters can visit and take her out." He conceded that while the cross petitioner had testified that she desired the AIP to reside with her, this plan, in view of the animosity between the two sisters, was "not going to work." Petitioner's counsel argued that the jurat in the power of attorney was deficient, rendering the instrument void.

Subsequent to the hearing, petitioner's counsel sent a letter to the court, with a copy to the cross petitioner, indicating that the cross petitioner had ceased paying the AIP's "rent" to the petitioner. The cross petitioner's attorney sent a letter in response stating that she was expending $1,560 monthly for a caregiver,[10] that the AIP has only $1,414 in savings, and that after expenses, the AIP has no available funds to pay for "personal items . . . and over-the-counter medications and supplements." The cross petitioner has thus been unable to pay the "rent."

---

**10.** There was scant testimony concerning the caregiver at the hearing by either side. It is not disputed, however, as alleged in the cross petition, that $240 to $340 weekly in cash is paid to an unidentified person who cares for the AIP.

Findings of Fact and Conclusions of Law

It is determined that the following findings of fact have been established by clear and convincing proof upon the documentary evidence submitted and the hearing testimony:

## Incapacity of the AIP

Based on the hearing testimony, as well as the court's observations of the AIP, it has been shown by clear and convincing evidence that Miriam H. is an incapacitated person (IP), that she is likely to suffer harm unless a guardian of the person and property is appointed for her, and she is unable to appreciate the nature and extent of her disabilities. The testimony made clear that she is unaware of her finances, her ailments and her physical limitations. The IP is presently nonverbal and uncommunicative. She requires assistance with all activities of daily living, including feeding, taking medication, bathing and dressing, due to advanced Alzheimer's disease. She appeared at the hearing in a wheelchair, but the testimony indicated that she can ambulate, with assistance. Her current inability to carry out the activities of daily living, coupled with her diagnosis of Alzheimer's dementia, and the general knowledge that this is a progressive condition, indicate that the IP will continue to require assistance with her personal needs and financial condition.

## Necessity of the Appointment of a Guardian

While it is clear to the court that the IP is incapacitated, that finding alone does not warrant appointment of a guardian. Mental Hygiene Law § 81.02 requires that the court engage in a two-pronged analysis before reaching a conclusion as to the necessity for the appointment of a guardian. Before making an appointment, the court must find: (1) that the appointment of a guardian is "necessary to provide for the personal needs of that person, including food, clothing, shelter, health care, or safety and/or to manage the property and financial affairs of that person"; and (2) "that the person agrees to the appointment, or that the person is incapacitated." (Mental Hygiene Law § 81.02 [a] [1], [2]; *Matter of Daniel TT.*, 39 AD3d 94 [3d Dept 2007].)

In determining the necessity for the appointment of a guardian, the court must consider the report of the court evaluator (Mental Hygiene Law § 81.02 [a]) and the "sufficiency and reliability of available resources" (Mental Hygiene Law § 81.02 [a] [2]) which may be available to satisfy the AIP's personal needs and property management without the need for a guardian.

(Mental Hygiene Law § 81.02 [a].) "[A]vailable resources" include home care providers, powers of attorney, health care proxies, and trusts. (Mental Hygiene Law § 81.03 [e].) "Such an appointment may be obviated where the alleged incapacitated persons have effectuated plans for the management of their affairs *and are possessed of sufficient resources to protect their well-being.*" (*Matter of Daniel TT.*, 39 AD3d at 97 [emphasis added]; *see also Matter of May Far C.*, 61 AD3d 680, 680 [2d Dept 2009] [The "evidence adduced at the hearing established that (the AIP) effectuated a plan for the management of her affairs and possessed sufficient resources to protect her well being, thus obviating the need for a guardian over her person or property"].)

While both the petitioner and the cross petitioner seek the appointment of a guardian, the cross petitioner also argues that the previously executed advance directives are valid. In certain cases the existence of a valid power of attorney coupled with a valid health care proxy has obviated the need for appointment of a guardian. (*See e.g. Matter of Samuel S. [Helene S.]*, 96 AD3d 954, 957 [2d Dept 2012] [dismissing petition where power of attorney and health care proxy provided the AIP with "a high quality of comprehensive medical care . . . and provided for the management of his personal and property needs"] [internal quotation marks omitted].) That is not the case here.

The court notes it may set aside an advance directive if it finds that the

> "previously executed appointment, power, [or] delegation[ ] contract, conveyance, or disposition during lifetime or to take effect upon death, was made while the person was incapacitated or if the court determines that there has been a breach of fiduciary duty by the previously appointed agent. In such event, the court shall require that the agent account to the guardian." (Mental Hygiene Law § 81.29 [d].)

In the instant case, the court finds that the medical evidence shows that the IP was competent at the time that she executed the power of attorney and health care proxy. The court does not credit the petitioner's argument that an inconsequential defect in the format of the jurat warrants vacating the power of attorney, as argued by the petitioner. Nevertheless, the court also finds that the cross petitioner's actions amount to a breach of fiduciary duty in mishandling the IP's property and personal af-

fairs sufficient to justify revoking the power of attorney and health care proxy in favor of an independent court-appointed guardian.[11]

The court cannot overlook the fact that the cross petitioner failed to secure one of the IP's accounts, such that the account was paid to the State as unclaimed property. This alone constitutes serious mishandling of the IP's accounts. In addition, even as her own counsel conceded, it is "troubling" that the IP surrendered her interest in 1115 N—to the cross petitioner for no consideration, and gave the cross petitioner control of her affairs, and that the cross petitioner then used the equity in the home to purchase another residence for her own benefit. The result has been that the IP's funds have been used to pay "rent" for an apartment in the very home of which she was a co-owner.[12] The use of the IP's funds to pay "rent" for an apartment which according to the cross petitioner's own testimony she "barely uses" constitutes a mishandling of the IP's financial resources. Moreover, cash funds have been used to pay caregivers, none of whom have been shown to be qualified health professionals. The result of the management of the IP's affairs is that the IP's funds (other than her monthly income) are almost fully depleted, and the monthly expenses cannot be maintained out of the IP's resources.

Moreover, while it is commendable that the petitioner and cross petitioner have sought to keep their mother with them in the community, the IP's interests are not being served by keeping her in a private home, where she has trouble moving about, with caregivers of unknown experience and competence.

The cases cited above in which appointment of a guardian has been found unnecessary show that the AIP both effectuated a plan for the management of his or her affairs, which obviated the need for a guardian, *and* that the AIP possessed sufficient resources to protect his or her well being. (*See e.g. Matter of Crump [Parthe]*, 230 AD2d 850 [2d Dept 1996].) Here, to the contrary, even if the court were not vacating the advance directives, it is conceded that the IP's resources are insufficient to sustain the arrangements made by the petitioner and cross

---

**11.** There was insufficient evidence, based on an alleged bank statement found by the petitioner and not preserved for trial, that the cross petitioner diverted funds from a bank account maintained by the IP.

**12.** The court credits the testimony of Clinvern Delroy Murray, Esq., that the IP was competent when she transferred her interest in the property to the cross petitioner.

petitioner, and thus the appointment of a guardian would be required.

Consequently, the advance directives are set aside, based on the mismanagement of the personal and financial affairs of the IP. Moreover, the same mismanagement which has lead to the current state of affairs requires the appointment of an independent guardian, as the cross petitioner conceded. The petitioner and cross petitioner have reached a point of personal animosity at which they are unable to cooperate in effectuating the best interests of the IP, and thus they would not be able to work together as co-guardians. The testimony bears out that they are unable to agree on the place of abode of the IP, unable to agree on timing of medical appointments, and unable to agree on health care decisions. Moreover, to appoint one sister to the exclusion of the other would potentially result in an exacerbation of the familial hostility which presently exists, and potentially, a continuation of the present situation, where one sister would seek to exclude the other from visiting the IP.

The court notes, also, that various factors weigh against appointing either sister as guardian of the property. Initially, it is observed that "bitter dissension between the incapacitated person's family members justifie[s] the appointment of a neutral third-party guardian." (*Matter of Ollie D.*, 30 AD3d 599, 600 [2d Dept 2006].) The cross petitioner has failed to secure all of the property of the IP, despite having been appointed as agent under a power of attorney, resulting in an account being paid to the State as unclaimed property. Moreover, the petitioner has a history of financial unreliability, and misuse of the IP's funds, which indicates that the petitioner should not be appointed as guardian of the property.

A guardianship of the person and property is required for an indefinite duration.

Upon the testimony taken at the hearing and the documents submitted, the court will appoint *Family Service Society of Yonkers, 30 South Broadway, 5th Floor, Yonkers, New York 10701, telephone number 914-963-5118,* as guardian of the IP's person and property in the judgment to be settled herein.

The guardian shall consider allowing the IP to remain in the home of one of the daughters, if that would be in the interest of the IP, and all appropriate arrangements made and qualified caregivers obtained. The court notes, however, that the IP has difficulty ambulating and navigating steps, which the guardian shall take into account in making a determination as to the

place of residence of the IP. Moreover, the guardian shall take into account the level of supervision required for the IP, the level of stimulation and care required for the IP which may be available in a facility, such as a nursing home, rather than a private residence, the safety of staying in a private home, and all other relevant factors in making a determination.

*The previously executed powers of attorney and health care proxy executed by the IP are hereby vacated, and the judgment shall provide that the cross petitioner as agent account to the guardian. (Mental Hygiene Law § 81.29 [d].)*

*All property and assets of the IP are restrained, and no person is permitted to remove, transfer, assign or dissipate any of the funds or property of the IP, including but not limited to any bank accounts, pension benefits, and annuity payments, and said restraint shall continue in full force and effect until such time as Family Service Society of Yonkers files its commission herein.*

The guardian of the person shall be granted those powers listed under Mental Hygiene Law § 81.22 which are necessary and sufficient to provide for the personal needs of the person. Those powers include as follows:

a. to determine who should provide personal care or assistance;

b. to make decisions regarding the social environment and other social aspects of the life of the incapacitated person;

c. to choose the place of abode of the IP, including but not limited to nursing home or community residence; *however, if relocation is placement in a nursing home, such placement is subject to prior court approval*;

d. to apply for government and private benefits on behalf of the incapacitated person;

e. to authorize access to or release of confidential records;

f. to consent to or refuse generally accepted routine or major medical or dental treatment subject to the provisions of section 81.22 (a) (8) of the Mental Hygiene Law dealing with life sustaining treatment; the guardian shall make treatment decisions consistent with the findings herein pursuant to Mental Hygiene Law § 81.15 and in accordance with the incapacitated person's wishes, including the incapacitated person's religious and moral beliefs, or if the incapacitated person's wishes are not known, and cannot be ascertained with reasonable diligence, in accordance with the incapacitated person's best interests, including a consideration of the dignity and unique-

ness of every person, the possibility and extent of preserving the incapacitated person's life, the preservation, improvement or restoration of the incapacitated person's health or functioning, relief of the incapacitated person's suffering, the adverse side effects associated with the treatment, any less intrusive alternative treatments, and such other concerns and values as a reasonable person in the incapacitated person's circumstances would wish to consider; and

g. to determine whether the incapacitated person should travel.

The guardian of the property shall have the following powers:

a. to make reasonable expenditures from the incapacitated person's assets, for the purpose of providing support of the incapacitated person in the event the annual income is insufficient to meet the incapacitated person's needs;

b. to marshal and invest the incapacitated person's assets in investments eligible by law for the investment of trust funds and to dispose of investments so made and reinvest the proceeds as so authorized; and to make claims to recover any unclaimed property belonging to the IP in the possession of the State of New York;

c. to pay any existing debts or claims which have been proven to the satisfaction of the guardian as being properly due and owing;

d. to preserve, protect and account for such property faithfully; to retain or employ attorneys, accountants or other professionals to assist in the performance of the duties of the guardian;

e. the guardian of the property may not alienate, mortgage, lease or otherwise dispose of real property without the specific direction of the court obtained upon the proceedings taken for that purpose as prescribed in article 17 of the Real Property Actions and Proceedings Law, provided however, that without instituting such proceedings, the guardian of the property may, without the authorization of the court, lease any real property for a term not exceeding five years;

f. to pay funeral expenses;

g. to engage in Medicaid planning, however any transfers of assets shall be effectuated only upon proper application to the court;

h. to file tax returns and pay tax liabilities; and

i. to defend or maintain any civil judicial proceeding.

These powers constitute the least restrictive form of intervention consistent with the incapacitated person's functional limitations.

The guardian shall have the power to retain an attorney solely necessary for legal work, or an accountant to assist in the preparation of the initial report, annual accountings, and final report or to assist in the preparation of federal and state income tax returns, subject to court approval of fees.

The guardian shall pay to its attorney(s) from the assets and/or income of the incapacitated person the sum of $300 as for legal fees pertaining to the creation of the guardianship, including preparation and filing the oath and designation, preparing and obtaining the Guardianship Commission, reviewing the file and rendering initial advice.

The guardian shall be compensated at the rate of $450 per month, which sum shall be deducted from the incapacitated person's income and/or assets on a monthly basis.

If such sum is deducted from the IP's income then, upon the approval of the New York City Human Resources Administration, such sum may, in addition, be deemed excluded from the incapacitated person's income for the purposes of the Medicaid calculation of net available monthly income, because the appointment of a guardian herein was necessary to ensure the safety as well as the physical, medical and clinical well-being of the incapacitated person, and the expenditure of such is necessary so that the services of an appropriate guardian can be provided.

The requirement that the guardian shall attend a training program approved by the Chief Administrator of the Courts will be waived pursuant to Mental Hygiene Law § 81.39 in the judgment to be settled.

The filing of a bond will be waived in the judgment to be settled herein.